# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ERNESTO MALDONADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 06 C 4149 |
| ) | |
| SINAI MEDICAL GROUP, INC., et al., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendants. ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Ernesto Maldonado was permanently and almost completely paralyzed from the waist down by a bacterial infection in his spine after he was improperly treated at Mount Sinai Hospital Medical Center ("Mount Sinai"). He filed this action against Mount Sinai and a number of medical treaters for professional negligence. Because Mount Sinai and its employees are deemed agents of the U.S. Public Health Service, the case arises under the Federal Tort Claims Act, 28 U.S.C. §2671 *et seq.* The government has substituted for Defendants and has conceded liability for Mr. Maldonado's spinal injury. In January 2010, this court held a bench trial on the issue of damages only. For the reasons explained here, the court awards Mr. Maldonado a total of $8,330,182.00 in compensatory damages, to be offset by the value of Plaintiff's settlement with the other tortfeasors in this case.

## BACKGROUND [1]

In July 2004, Ernesto Maldonado, then 56 years old, sought treatment for pneumonia and chest pains at Mount Sinai, a federally-funded medical facility. It is undisputed that Maldonado suffered from what should have been a readily apparent bacterial infection in his spine. (Trial Tr. 323-26.) The evidence at trial confirmed that, had the infection been timely and completely treated with intravenously-administered antibiotics, Maldonado would likely have experienced a complete recovery. (*Id.* at 323-29.) Unfortunately, although the doctors at Mount Sinai initiated appropriate

---

[1] In this case, most of the facts are undisputed. Where the parties have presented contradictory evidence, the court presents its own findings, followed by conclusions of law.

antibiotic therapy, they discontinued the therapy prematurely and, as a result, the infection spread and damaged the bones in Maldonado's spine, causing a compression of the nerves in his spinal cord.  (*Id.* at 330-32.)  Prior to trial, Maldonado settled with other tortfeasors, and the government substituted as Defendant for Mount Sinai.  The United States, as the sole remaining Defendant, conceded liability for the injuries resulting from Maldonado's spinal infection.  The government disputed, however, the extent to which Maldonado's current state of paralysis is the exclusive result of the initial infection, rather than the result of complications associated with Maldonado's preexisting health conditions.

Maldonado was released from Mount Sinai on August 2, 2004, unaware that the infection continued to eat away at his vertebrae.  Two weeks later, on August 14, Maldonado began experiencing a tingling pain in his legs and became unable to walk or control his bladder.  (*Id.* at 233.)  After consulting a physician and a chiropractor, Maldonado's family brought him to Rush University Medical Center ("Rush") in Chicago, where Maldonado underwent emergency surgery in an attempt to prevent further damage to his spinal column.  (Ratliff Dep. at 52.)[2]  Over the ensuing month, Rush doctors were required to perform five separate surgeries on Maldonado to address his condition.  In the course of these procedures, surgeons extracted a portion of Maldonado's spine, removed one of his ribs, and fused several of his vertebrae together with long screws and a reinforcing metal cage. (Trial Tr. at 257-60; Ratliff Dep. 49-98.)  The evidence showed that these invasive surgical procedures taxed Maldonado physically and emotionally.  Throughout his several surgeries and three months of hospitalization, Maldonado reported experiencing intense and persistent pain.  (Trial Tr. at 262; 236-37.)  "Week after week, surgery after surgery, I just wanted them to leave me alone, but they wouldn't," Maldonado testified.  "I just didn't want it anymore . . . I felt really bad all the time."  (*Id.* at 236.)

---

[2] Dr. John Ratliff is one of the neurosurgeons who treated Maldonado when we was first hospitalized at Rush.  By agreement of the parties, videotaped depositions of Dr. Ratliff and his Rush colleague Dr. Juan Jimenez were played during the trial and their deposition testimony was entered into the trial record.

2

Despite the efforts of Rush doctors, Maldonado's spinal injuries ultimately rendered him permanently and nearly totally paraplegic. While Maldonado is potentially capable of standing briefly or taking a few steps with the help of a walker, he currently retains less than 5 percent of his former leg strength and will likely be confined to a wheelchair for the rest of his life. (*Id.* at 86-87.) His condition is "static," meaning it will likely not improve. (*Id.* at 95.) Maldonado is incapable of performing common daily tasks without assistance. He cannot bathe himself, dress himself, or prepare his own meals without help from family members. (*Id.* at 86-93; 177-80; 237-38.) He is forced to wear adult diapers because he cannot control his bowels or bladder, and he must rely on family members to change and clean him when he uses the washroom. (*Id.* at 182-83; 237.) He cannot get into or out of his bed without assistance. (*Id.* at 238.) He is incapable of sexual intimacy, and he continues to experience substantial physical pain in his lower back and chest. (*Id.* at 238-40; 136-37.)

Maldonado's day-to-day difficulties are compounded by the lack of wheelchair access or other necessary accommodations in his home. The doors and hallways in the home are too narrow or turn too sharply to allow for easy wheelchair access. (*Id.* at 101-03.) Because of the configuration of Maldonado's bedroom, he has difficulty transferring from his bed to his wheelchair. (*Id.*) The bathrooms in the home are not wheelchair accessible, necessitating that Maldonado's adult son or daughter-in-law physically lift and carry him to the bath or commode. (*Id.* at 101-07.) Maldonado's automobile lacks a wheelchair lift, and his son is required to lift him into the vehicle if Maldonado ever wishes to travel away from his home. (*Id.* at 114-16.)

Before his injury, Maldonado had been a professional auto mechanic and welder. (*Id.* at 225-26.) In his spare time, he had enjoyed cooking, playing soccer, and participating in dance competitions with his life partner of 33 years, Guadalupe. (*Id.* at 226-31.) He had also assisted in the care of Guadalupe's two adult children, who are mentally disabled and require substantial supervision and assistance. (*Id.* at 228-29.) Since the injury, Maldonado has been unable to work, to meaningfully contribute to the household, or to engage in almost any of the activities that he

formerly enjoyed. The loss of his vitality and independence has taken a substantial emotional toll. (*Id.* at 191.) "Sometimes, I resign myself to it," Maldonado testified. "But when you see people around you, people that are close to you, sometimes that depresses me a lot, just to realize that I am unable to do now what I was able to do before. And I get these deep feelings. And so I just get away from my own people so I can go cry. I feel frustrated sometimes. Me, a man who was very strong before, now I have been reduced to nothing." (*Id.* at 240.)[3]

Maldonado's situation is further complicated by other health issues, which predate his spinal injury. He has a history of lung disease, obesity, hypertension, and diabetes, for which he takes medication. (*Id.* at 94.) These preexisting problems compound Maldonado's physical limitations to some extent, and Maldonado's paraplegia renders him unable to manage his other health problems with measures like exercise. (*Id.* at 93-96; 373-74.) At trial, the parties disputed the extent to which Maldonado's current physical limitations are the exclusive result of his spinal injury, rather than his other health issues. The government presented Maldonado's medical records from 2007, which tended to show that his leg strength and mobility substantially worsened between 2007 and the time of trial. This change, the government argued, suggests that the level of Maldonado's paralysis results substantially from intervening health issues, like diabetes or a possible stroke, rather than the spinal injury alone. While he acknowledged the complications posed by Maldonado's co-morbidities, Plaintiff's medical expert, Dr Richard Katz, testified that "there was no question in [his] mind" that Maldonado's paraplegia was the direct result of the infection in his spinal column. (*Id.* at 89.) "I have no differential diagnosis, no competing hypothesis," Katz said. "That's the reason." (*Id.*) The government acknowledged that Katz's testimony was "candid and impartial." (*Id.* at 405.) As the court explains below, it credits Katz's testimony in this area. Katz calculated Maldonado's remaining life expectancy at 8 years, a significantly truncated projection for someone

---

[3] Mr. Maldonado was emotionally overcome and wept at several points during his trial testimony. The depths of his despair are revealed in his statement: "I just don't want to be a burden to my wife and to my children anymore. So I read my Bible, try to find something in the Bible that can help me because I have been wishing I was dead." (Trial Tr. 240-41.)

of Maldonado's age. (*Id.* at 77-79.) Katz predicted Maldonado's paraplegia would shorten his life by three or four years and attributed the rest of the reduction in Maldonado's life expectancy to his other health issues. (*Id.* at 79-80.) The government presented no expert testimony or other evidence to the contrary.

In closing argument, Plaintiff sought $816,182.00 for his past medical expenses and $881,420 for his projected future injury-related expenses. (*Id.* at 394). Plaintiff also sought $12.5 million in non-economic damages: $7.5 million to compensate Maldonado for his permanent disability; $4 million to compensate him for his pain and suffering; and $1 million to compensate him for the 3-year reduction in his life expectancy caused by his paraplegia. (*Id.* at 396-98.) The government responded by urging the court to consider several comparable cases with substantially lower awards than Plaintiff requested. (*Id.* at 414-16.) The court gave Maldonado the opportunity to submit a list of comparable cases as well. After considering the evidence and reviewing the comparable cases, the court now awards Maldonado the sum of $8,330,182.00 in compensatory damages, to be offset by the amount Maldonado obtained in settlement from other defendants.[4]

## **DISCUSSION**

Ernesto Maldonado, formerly a vibrant and capable member of his community and family, now faces a tragically altered future as the result of a medical error in response to a serious but treatable infection. Quantifying the harm he has suffered—the lingering pain of multiple invasive surgeries, the impairment to his abilities, the reduction in his privacy and independence, and the indignity of having to rely on others for such basic life functions as using the washroom or bathing—in financial terms is awkward, but a financial remedy is the only one available under the law. When a federal judge is the trier of fact, she is required to explain the grounds of her decision.

---

[4] An offset in the amount of the settlement value is appropriate to prevent a double recovery that would result in a windfall to Maldonado. *See Zivitz v. Greenberg*, 279 F.3d 536, 539 (7th Cir. 2002) (quoting *Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999)("[Under Illinois law,] when a settlement is reached in good faith, the amount a plaintiff receives on any claim against any other nonsettling tortfeasors is to be reduced by the amount stated in the settlement agreement, or the amount actually paid by the settling tortfeasors, whichever is greater.")

FED. R. CIV. P. 52(a). "This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion." *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001).

The Seventh Circuit has explained that, in calculating damages for difficult-to-quantify harms, judges should not simply pluck figures "out of the air." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). Instead, the court should provide context to its decision by considering not only the circumstances of the individual plaintiff, but also awards made in similar cases. *Id.* The court may also derive further guidance by undertaking a ratio analysis, examining non-economic damages relative to economic damages in comparable cases. *Id.* at 777. The court keeps these standards in mind as it explains its reasoning below.

### A.     Maldonado's Economic Damages

The government does not appear to dispute Maldonado's past medical expenses, which are well documented. Plaintiff will recover the full $816,182.00 in this category of damages. Maldonado's projected future medical expenses are based on a lifetime healthcare plan developed by Dr. Katz, a specialist in physical medicine and rehabilitation. The plan includes Katz's estimates for the cost of converting Maldonado's home and vehicle for wheelchair accessibility (or moving to a new home, if necessary) and the cost of part-time professional nursing care for the remainder of Maldonado's life. The plan does not include expenses for treating Maldonado's other illnesses, like medication for his hypertension or diabetes. Katz excluded these costs on the ground that Maldonado would have been required to bear them even had he not been rendered paraplegic. Katz's cost estimates for adaptations to Maldonado's home were based on cost allowance data that the Veteran's Administration makes available for permanently disabled servicemen and servicewomen. Katz's calculations appear to be reasonable, and the government has presented no convincing objections to the lifetime healthcare plan evidence he offered.

The government does find minor fault with Katz's conclusions. For example, the government takes issue with Katz's estimate that moving Maldonado and his family to more

wheelchair-friendly quarters would cost $10,000. The government suggests that this figure is overstated for an in-town move, but it presents no evidence to rebut that estimate. The court will award the full $10,000 for moving costs. The government also quibbles with Katz's estimate of $22 per hour as a fair wage estimate for a certified nurse's assistant to provide in-home care. Again, absent evidence that rebuts this estimate, the court overrules the objection to this request which, in the context of this case, is *de minimis.* There is, of course, inherent uncertainty in any projection of a patient's future medical expenses even for static conditions like Maldonado's paraplegia; medical innovation occurs, market curves shift, purchasing power fluctuates. There is no guarantee that the cost of in-home medical treatment will remain constant for the next eight or nine years, the duration of Maldonado's life expectancy. This uncertainty does not undermine Katz's estimate, however, which appears to be credible and to be based upon an informed, good-faith assessment of Maldonado's likely future needs. The court accepts Katz's estimates.

The government's final objection is that Katz, as he himself acknowledged, did not reduce his total valuation to present value, that is, Katz did not account for the benefit to Maldonado of receiving the money as a lump sum rather than incrementally in the future. Neither the government nor Katz attempts to suggest what a proper recovery would be if it were controlled for present value. By the court's calculation, assuming a modest one percent discount rate and eight years of future expenses, the present value of Katz's future care estimate is roughly $814,000.00.[5] Maldonado will recover that entire amount in compensation for his future medical expenses.

As Maldonado makes no other claims for lost wages or the like, the court sets his total recovery for economic damages at $1,630,182.00.

### B. Maldonado's Non-Economic Damages

---

[5] Present value can be estimated by dividing the future value of an amount by the sum of one plus the discount rate to the power of the number of years, expressed algebraically as $PV = FV/(1+r)^y$. In this case, $PV = 881{,}420/(1 + .01)^8 = 813{,}976.58$. *See e.g. United States v. Broderson*, 67 F.3d 452, 457 (2nd Cir. 1995)(explaining how to use a present value calculation to account for the time-value of money).

Assessing Mr. Maldonado's non-economic damages is much more challenging. Though these harms are difficult to monetize, "[p]ain and suffering are perceived as costs, in the sense of adversities that one would pay to be spared, by the people who experience them. Unless tortfeasors are made to bear these costs, the cost of being adjudged careless will fall and so there will be more accidents and therefore more pain and suffering." *Jutzi-Johnson*, 263 F.3d at 758.

Maldonado will never be able to walk, dance, or play soccer again. He will not be capable of sexually intimacy with his life partner of more than 30 years. For the rest of his days, Maldonado will rely on others to assist him with the most basic and (for most of us) private functions of daily life. The losses Maldonado has suffered are grave, and the evidence shows he has endured substantial physical pain and mental anguish as a result of his ordeal. Recognizing that Maldonado's hardships are unique to his life and condition, the court nevertheless seeks to derive guidance in quantifying these harms by consulting similar cases. The court has reviewed all of the cases submitted by the parties and several that it has independently identified.[6] Of all the cases that the court has reviewed, the following five cases, ranked in order of award size, are the most instructive with regard to Maldonado's situation. All five cases were cited by the government in its closing argument and have been acknowledged by Maldonado as potentially comparable. (Trial Tr. at 414-16.)

> (1) *Paul v. Ho,* JVR No. 490830, 2008 WL 3250028, *1(Unknown N.Y. State Ct., March 2008) – A 60-year-old male was rendered an incomplete paraplegic when his physician improperly performed a spinal procedure. The physician also failed to order the necessary diagnostic tests to determine the plaintiff's postoperative condition. A jury awarded the plaintiff $7.9 million based solely on the plaintiff's claim for pain and suffering damages. The award was later reduced pursuant to a agreement entered into by the parties before trial.

---

[6] In addition to those discussed here, Defendants also submitted several cases that ended in settlement. Because many factors that influence settlement are unrelated to the damages the plaintiff has suffered (the parties' interest in an expeditious resolution and the strength of the plaintiff's liability evidence, for example), the court declines to give these cases substantial consideration.

(2) *McClafferty v. Radionics; Tyco Healthcare,* JVR No. 441297, 2005 WL 4040961, *1 (Unknown Cal. State Ct., May 2005) – A 60-year-old female suffered incomplete paralysis of her lower extremities and bowel and bladder incontinence following a surgery utilizing an unsafe catheter electrode that was negligently manufactured by the defendants. A jury awarded the plaintiff roughly $3 million for her past and future medical expenses and roughly $6.6 million for pain and suffering damages. The award was subsequently offset based on the apportionment of negligence between the device manufacturer and the doctors who performed the surgery.

(3) *Maggos v. Prarie Material Sales Inc.*, No. 02 L 2005, 2005 WL 1491197 (Cir. Ct. of Cook County, Ill., May 25, 2005) – A 34-year-old Illinois woman was temporarily paralyzed and forced to undergo a several-level vertebrae fusion with the insertion of rods and screws into her spine following an automobile accident caused by the defendant's negligent agent. She eventually regained full strength and sensory perception in her legs, but was incapable of engaging in certain activities that she had enjoyed, such as skiing. Maggos claimed roughly $870,000 in past and future medical expenses. A jury awarded her a total award of $5.5 million, suggesting that it awarded Maggos $4.63 million to compensate her for pain and suffering even though she made a near-complete recovery.[7]

(4) *Armato v. 1100 Service*, JVR No. 488947, 2007 WL 5433637 *1 (Unknown Mo. State Ct., Oct. 2007) – A 54-year-old male suffered an acute spinal cord injury causing him to lose sensation in his lower extremities and reduced dexterity in his left hand when he was struck in the head by a metal tank at the defendant's job site. A jury awarded Armato roughly $850,000 in past and future medical expenses and $75,000 in lost wages. The jury also awarded Armato $1.8 million for pain and suffering and awarded his wife $300,000 for her loss of services claim. The total verdict of approximately $3.2 million was later reduced by 3 percent to account for Armato's contributory negligence. The Missouri Appellate Court upheld the verdict in a per curiam decision. 279 S.W.3d 214 (Mo. App. W.D. 2009).

---

[7] In *Arpin*, the Seventh Circuit specifically urged courts to look at awards in both the jurisdiction in which a given case arises "and elsewhere." 521 F.3d at 776. Illinois damages law applies in this case. FTCA claims are governed by the substantive law of the state in which the alleged tort occurred and "damages law is substantive law." *See id.; see also Stratmeyer v. United States*, 67 F.3d 1340, 1345 (7th Cir. 1995). As Judge Posner explained in *Arpin*, however, it is irrelevant to this court's analysis whether Illinois law requires or even encourages damages comparisons in similar cases. 521 F.3d at 776. The decision to consider comparison evidence is procedural, as the purpose and tendency of the comparison inquiry is to reduce variances in awards from across jurisdictions. *Id*.

In addition to *Maggos*, the court reviewed several Illinois cases, including *Holton v. Memorial Hosp.*, 176 Ill.2d 95, 679 N.E.2d 1202 (1997). *Holton* involved a female plaintiff who suffered from the same type of spinal infection as Maldonado and who, in 1991, was similarly rendered paraplegic and incontinent after being misdiagnosed. *Id*. at 99-104, 679 N.E.2d at 1204-06. A jury awarded Ms. Holton a verdict of $8.7 million in total damages, but the trial court later remitted the award to $7.2 million. The appellate court further reduced the award to offset for settlements between Holton and other defendants, and the case was later reversed by the Illinois Supreme Court on other grounds. *Id*. at 135.

(5) *Ornelas v. Boardwine, M.D.*, JNR No. 437970, 2004 WL 4000065 (Unknown Mo. State Ct., March 2004) – A 65-year-old male suffered limited use of his legs, necessitating the use of a walking stick and impotence, following a spinal fusion performed by the defendant doctor. The plaintiff claimed that he was not adequately informed of the possible risks of the surgery and had not given informed consent. A jury awarded the plaintiff $498,000 in compensation for his pain and suffering, and awarded his wife $25,000 for her loss of services claim.

Taken together, these cases illustrate a range of non-economic damages between $0.5 million and $8 million. In the court's view, Maldonado is entitled to an award near the high end of this scale. Unlike the plaintiff in *Armato*, who suffered only reduced sensation in his legs, or the plaintiff in *Ornelas*, who retained his ambulatory ability with the assistance of a walking stick, Maldonado is permanently and almost completely paralyzed from the waist down. His paralysis has greatly impaired his ability to perform necessary life functions like walking, dressing, bathing, and preparing meals. For his remaining years, Maldonado will be incontinent, impotent, and confined to a wheelchair. Maldonado's paraplegia also makes it considerably harder for him to manage his preexisting medical conditions.

The government contends that the court must limit the award in recognition that Maldonado suffered from preexisting health conditions. The court declines to do so. It is well-recognized that tortfeasors take their victims as they find them. *See Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1983); *Phillips v. United States*, No. 05 760, 2008 WL 5082973 (S.D. Ill., Nov. 25, 2008). Although the medical testimony confirms that Maldonado's paraplegia interacted with his existing medical conditions in complex ways, the witnesses called by Plaintiff concluded that Maldonado's paralysis was the direct result of his spinal injury. The government offered no medical testimony or other persuasive evidence that Maldonado's paralysis was partially caused by any condition other than his spinal injury. The court credits Plaintiff's evidence on this issue, and will not reduce Maldonado's award based on speculation that some preexisting or intervening medical condition may have contributed to his paralysis.

As the cases reviewed above demonstrate, Maldonado is entitled to substantial compensation for his pain and suffering. In *Maggos,* an Illinois jury awarded the plaintiff almost $5 million in pain and suffering damages because she had been forced to undergo spinal fusion surgery and was rendered unable to engage in certain athletic activities. The harm Maldonado experienced is significantly worse. He endured the same painful spinal fusion procedure but, unlike Maggos, Maldonado will not recover. Where Maggos lost the ability to ski (an activity unavailable to many otherwise healthy Americans), Maldonado has lost the ability to lead an independent life and is, in the court's view, entitled to a larger recovery for his non-economic injuries. *McClafferty* and *Paul* are also instructive. The plaintiffs in those cases were close in age to Maldonado and suffered similarly severe paraplegia. Juries awarded McClafferty and Paul $6.6 and $7.8 in non-economic damages, respectively. In the court's view, these two cases provide the clearest guidance in quantifying Maldonado's harm.

Maldonado seeks non-economic damages in three categories: loss of life, pain and suffering, and disability. The categories are somewhat arbitrary–Maldonado's reduced life expectancy and pain and suffering are consequences of his ongoing disability–but do provide a framework for consideration of Plaintiff's damages request. With regard to loss of life, the court finds that Maldonado is entitled to $450,000 as compensation for the three-year reduction in his life expectancy that is directly attributable to his paraplegia. This amounts to $150,000 per year of decreased life, a reasonable valuation of Maldonado's life and contributions to his close and devoted family. For pain and suffering, the court awards Maldonado $2 million to compensate him for the substantial pain of his multiple surgeries and the ongoing emotional and physical strain that he endures on a daily basis. The court further awards Maldonado $4.25 million to compensate him for his ongoing paraplegia-related disabilities. This award addresses Maldonado's inability to walk, dance, or to enjoy the many activities that his paraplegia prevents him from pursuing. Included within these losses is the intensely humiliating loss of ability to use the toilet and to bathe himself

11

without assistance. The sum of these categories of non-economic damages amounts to $6.7 million, a total that fits soundly within the guide the court discerns from *McClafferty* and *Paul.*

    **C.    The Damages Ratio**

In *Arpin*, the Seventh Circuit suggested that district courts also consider the ratio of non-economic damages to economic damages in determining reasonable tort awards. This suggestion has met with some resistance in the district courts. *See, e.g., Cason v. Holmes Transport, Inc.*, No. 08 C 617, 2009 WL 4730959, *3 (S.D. Ill. Dec. 8, 2009) ("The inevitable result of such a plug and chug approach will be a body of law which establishes a Blue Book value on grief and emotional trauma and which will certainly stand for the proposition that higher income people have more valuable relationships with loved ones than lower earners.") Whatever the merits of this criticism, the ratio approach is merely a *suggested* method of analysis. It is not required. *See Arpin v. United States* ("Arpin II"), No. 04 C 128, 2009 WL 3816844 *1(S.D. Ill. Nov. 13, 2009) (characterizing the *Arpin* opinion as "suggest[ing], without absolutely prescribing" a ratio approach). In this case, a ratio comparison confirms the court's valuation of Maldonado's non-economic damages.

The court's award of $6.7 million in non-economic damages is roughly 4.2 times the amount of Maldonado's economic damages, which consist exclusively of his past and future medical expenses. In *Maggos,* the most instructive Illinois case, the plaintiff recovered pain and suffering damages that were roughly 5.3 times the amount of her economic damages. As in this case, Maggos's economic damages consisted only of her past and future medical expenses and were similarly uninflated by claims for lost wages. The ratio in that case is closely consistent with today's decision. Even if it were not, there is good reason to think that the ratio analysis would not mandate a reduction in Maldonado's award. The jury in *Paul* awarded that plaintiff $7.9 million in non-economic damages even though he did not claim any economic damages at all. Maldonado's similar recovery of $7.7 million, slightly more than four times his economic damages, is reasonable

and consistent with the comparative cases.

No sum of money can make a plaintiff physically whole again after he has suffered a catastrophic injury like the one involved here. The court's award compensates Maldonado for the hardship he has suffered and ensures that he will face his remaining challenges with some measure of solace, comfort, and financial security. Maldonado will recover $1,630,182.00 for his past and future medical expenses and $6.7 million in compensation for his disability, pain and suffering, and reduced life expectancy. In accordance with Illinois law, this amount will be offset by the amount Maldonado has obtained in settlement with the other tortfeasors in this case.

## **CONCLUSION**

For the reasons stated herein, the court orders Defendant United States to compensate Plaintiff Ernesto Maldonado in the amount of $8,330,182.00, to be offset by the value of any settlement Plaintiff has reached with the other tortfeasors in this case.

ENTER:

Dated: April 13, 2010

_____
REBECCA R. PALLMEYER
United States District Judge